IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RITA WILLIAMS,

    *Plaintiff,*

v.

G4S SECURE SOLUTIONS (USA),
INC.,

    *Defendant.*

Civil Action No.: ELH-10-3476

## MEMORANDUM OPINION

Rita Williams, plaintiff, brought suit against her former employer, G4S Secure Solutions

(USA), Inc. ("G4S"), lodging claims of discrimination on the basis of sex (Count I) and

retaliation (Count II), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

codified, as amended, at 42 U.S.C. § 2000e *et seq. See* Complaint (ECF 1).[1]  G4S has moved

for summary judgment ("Motion," ECF 22), and has filed a supporting memorandum ("Memo,"

ECF 22-1), as well as several exhibits.[2]  Plaintiff opposes the Motion, and has filed a cross

motion for summary judgment as to Count I ("Response," ECF 25), along with exhibits.[3]  The

---

[1]  During plaintiff's employment, G4S was known as Wackenhut Corporation
("Wackenhut").  The parties stipulated that "Wackenhut Corporation and G4S Secure Solutions
(USA), Inc. are the same entity for purposes of this litigation."  *See* ECF 27.  Accordingly, G4S
is the sole defendant in this case.  *See* ECF 28.

[2]  The defense exhibits include excerpts from the deposition testimony of Rita Williams
(Exhibit 1); the Affidavit of Jack Ferguson (Exhibit 2); "Rita Williams Work History 1/1/2008 –
9/30/2008" (Exhibit 3); excerpts from the deposition of Bernard Davis (Exhibit 4); excerpts from
the deposition of Jack Ferguson (Exhibit 5); excerpts from the deposition of Nicholas John Paros
(Exhibit 6); and a copy of a fax from Williams to Ferguson and Davis, dated August 25, 2008
(Exhibit 7).

[3]  Some of plaintiff's exhibits are duplicative of defendant's exhibits.  The exhibits
include excerpts from the deposition of Rita Williams (Exhibit 1); excerpts from the deposition
of Jack Ferguson (Exhibit 2); a report of December 30, 2008, signed by Ferguson (Exhibit 2,
Appendix 1); excerpts from the deposition of Nicholas John Paros (Exhibit 3); "Rita Williams
Work History 1/1/2008 – 9/30/2008" (Exhibit 3, Appendix 1); a document entitled "List of

motions have been fully briefed,[4] and the Court now rules pursuant to Local Rule 105.6, as no hearing is necessary.

## Factual and Procedural Background[5]

G4S is a staffing company that provides security personnel to its clients, upon request. Memo at 2.  In 2008, G4S had approximately forty accounts in the Baltimore area.  Defendant's Exh. 2 ¶ 22.

Williams began working as a security officer for Wackenhut on May 15, 2006. Defendant's Exh. 1 at 18:10-17.  It is undisputed that defendant was plaintiff's employer within the meaning of Title VII.

About a year after her employment began, plaintiff became a custom protection officer ("CPO") at Wackenhut.  *Id.* at 18:19-19:5.  As a CPO, plaintiff carried a company-issued handgun while on duty, and received "a great deal" more pay than an unarmed security guard. Plaintiff's Exh. 1 at 20:5-12.  During the course of her employment, plaintiff was assigned to

---

Employee's [sic] Working at Jai Medical Center From January 1, 2008 – September 30, 2008" (Exhibit 3, Appendix 2); Plaintiff's Answers To Interrogatories (Exhibit 4); the Affidavit of Rita Williams (Exhibit 5); "The Wackenhut Corporation Query On Retro" (Exhibit 5, Appendix 1); a "Notice Of Right To Sue" issued to Williams by the Equal Employment Opportunity Commission ("EEOC") on September 15, 2010 (Exhibit 5, Appendix 2); excerpts from the deposition of Bernard Davis (Exhibit 6); "The Wackenhut Corporation Baltimore Area Office Jai Medical Center Employees 8/6/07 – 10/25/09" (Exhibit 6, Appendix 1); an undated "Statement of Facts" signed by Davis (Exhibit 6, Appendix 2); the Affidavit of Gary Monroe (Exhibit 7); a letter of December 10, 2008, to Wackenhut from the Maryland Commission on Human Relations (Exhibit 7, Appendix 1); an undated "Statement of Facts" signed by Davis (Exhibit 7, Appendix 2); and a "List of Employee's [sic] Assigned to Jai Medical Center From January 1, 2008 – September 30, 2008" (Exhibit 8).

[4] I have also considered G4S's consolidated opposition to plaintiff's cross motion, and reply to plaintiff's opposition ("Reply," ECF 26), as well as plaintiff's response to G4S's opposition to her cross motion ("Surreply," ECF 29).  Plaintiff appended an "Enforcement Guidance" issued by the EEOC, dated December 3, 1997, to the Surreply (the "Guidance").

[5] As discussed *infra*, the Court construes the facts in the light most favorable to the non-moving party.

work security for clients at numerous locations for varying lengths of time.  *Id.* at 20:17-21:18; Plaintiff's Exh. 3, App'x 1.  She reported to Captain Jack Ferguson.  Plaintiff's Exh. 6 at 25:12-15.  Ferguson reported to Major Bernard Davis, *id.*, and Davis reported to the general manager, David Yurchak.  *Id.* at 16:10-15.

On January 11, 2008, plaintiff was scheduled to attend a training session at Jai Medical Center ("Jai"), a customer of the defendant.   Plaintiff's Exh. 5 ¶ 2.   She believed that "Wackenhut was giving [her] a regular, full-time position at Jai."  *Id.*  According to plaintiff, an assignment at Jai was highly favorable, because of its "regular daytime hours, a high hourly wage and multiple locations (four sites) in Baltimore City."  *Id.* ¶ 1.

During plaintiff's training at Jai on January 11, 2008, plaintiff spoke to Davis by telephone and told him that "she had heard that they didn't want females there."  Defendant's Exh. 4 at 46:1-3.[6]  Davis contacted the site supervisor, a Wackenhut/G4S employee, who told Davis that "the client said he didn't want any female officers there."  *Id.* at 46:12-13.  Davis then instructed Williams to leave, *id.* at 46:14-15, and Ferguson told plaintiff to head to "Cactus Willie's" for her shift, claiming that he had forgotten he was not to send females to Jai. Plaintiff's Exh. 4 at 3-4.

In her Answers to Interrogatories, plaintiff recounted that, in December 2006, *i.e.*, well before the January 2008 incident at Jai, another supervisor, Captain Evans, told her he had an opening at Jai, but then, "referring to her gender," said "Naw!  Williams you know you can't go there."   *Id.* at 3.   Thus, according to plaintiff, prior to January 2008, at least some Wackenhut/G4S personnel were on notice of Jai's policy.

---

[6] Davis testified at his deposition that plaintiff called him, *id.*, while plaintiff avers in her Answers to Interrogatories that it was Davis who called her.  Plaintiff's Exh. 4 at 3.  This discrepancy is not material.

At his deposition, Davis claimed that he first heard of Jai's preference for male guards on January 11, 2008.  Defendant's Exh. 4 at 45:11-46:18.  Nevertheless, Davis confirmed that he had assigned numerous employees to Jai, all of whom were male.  Plaintiff's Exh. 6 at 40:8-16.  Ferguson also denied prior knowledge of Jai's preference, and insisted at his deposition that "[t]he only time [he] was ever told about the preference was when Ms. Williams was there."  Defendant's Exh. 6 at 12:15-20.  But, he conceded that only male employees were assigned to Jai.  Plaintiff's Exh. 2 at 14:14-19.

After the January 11, 2008 training incident, Davis discussed Jai's policy with Yurchak, who informed him: "That is the client's policy, not Wackenhut's policy."  Plaintiff's Exh. 6 at 51:2-52:6.  Davis conceded that he never notified Jai that Wackenhut/G4S would not honor the policy, nor did he recommend termination of defendant's contract with Jai.  *Id.* at 53:11-20.  Although Davis denied that it was his "understanding that [he was] only supposed to assign male CPOs or security personnel to Jai...," *id.* at 53:3-7, he answered "Yes" when asked: "Do you believe that the policy imposed on Wackenhut by [Jai] discriminated against female Wackenhut employees?"  *Id.* at 55:17-20.

According to Ferguson, although Jai "did prefer to have male security guards at its locations, it was not a formal requirement that no female security guards work those sites."  Defendant's Exh. 2 ¶ 23.  Moreover, at his deposition, he did not "recall a single occasion on which Ms. Williams ever expressed any concerns about not being assigned to work at Jai Medical Center based on her sex[.]"  Plaintiff's Exh. 2 at 31:6-10.  Ferguson also opined that there is nothing wrong with a client demanding only male custom protection officers. *Id.* at 25:13-21.

Nicholas John Paros, a senior manager at G4S who was deposed as the defendant's corporate designee, explained that defendant's employees are "guests on client's [sic] sites," and he maintained that the clients "have an absolute right to remove us for any reason whatsoever." Defendant's Exh. 6 at 35:20-36:2.  According to Paros, defendant had "a contractual obligation with Jai Medical, which [it] honored."  *Id.* at 33:9-14.  Paros was "not sure" whether defendant had the right to terminate the contract with Jai.  *Id.* at 33:15-18.  Paros also testified, *id.* at 34:21-35:7:

> Wackenhut does not discriminate.  G4S does not discriminate.  And if a person was qualified, we would offer that person to a client.  If the client refused to accept that person, for any reason under their contractual right to do so, we would not participate any further in whatever they're doing, and we would place that employee in a proper position that they're qualified for.

After plaintiff's aborted training at Jai, she worked several short term jobs for Wackenhut/G4S.  Plaintiff's Exh. 3, App'x 1.  Defendant disputes that a regular, full-time position was available at Jai.  Davis testified that employees assigned to Jai had forty hours of work each week, and there was little turnover among them.  Plaintiff's Exh. 6 at 32:12-33:18.  At Ferguson's deposition on October 26, 2011, Ferguson stated that there *was* "turnover in the male employees assigned to Jai…during the term of [his] employment."  Plaintiff's Exh. 2 at 30:7-15.  But, in his affidavit, also dated October 26, 2011, Ferguson avers that there were no full or part time openings at Jai during 2008, and that the purpose of plaintiff's training session was to provide Jai with a capable substitute if one of the regular employees was absent.  Defendant's Exh. 2 ¶ 21.  Plaintiff's Exhibit 8, entitled "List of Employee's [sic] Assigned to Jai Medical Center From January 1, 2008 – September 30, 2008," shows seven of defendant's employees with dates of employment commencing at Jai in that period.  It is not clear from the document in what capacity the employees worked at Jai.

On March 8, 2008, plaintiff received a long-term assignment at the Renaissance Club.  *Id*. However, plaintiff was unhappy because she was working the evening shift.  So, she spoke to Davis and "asked to have [her] schedule changed,"  Plaintiff's Exh. 1 at 74:9-75:14, because she "wanted to work a day shift instead of an evening shift."  *Id*. at 75:12-14.[7]  It is not clear from the record whether a day shift was available to plaintiff.  But, shortly after plaintiff requested a change in shifts, she "received a call stating that [her] schedule had changed," and was "told not to go back" to the Renaissance Club.  *Id*. at 75:21-76:10.  Plaintiff stopped working at the Renaissance Club on March 24, 2008.  Plaintiff's Exh. 3, App'x 1.  Thereafter, plaintiff received short term assignments at Wendy's, the "MS Society," and Chesapeake Biological Labs. Plaintiff's Exh. 3, App'x 1.  Then, on April 21, 2008, plaintiff returned for a single shift at the Renaissance Club.  *Id*.

In his affidavit, Ferguson claims that in March 2008 Williams "requested to be taken off the Renaissance Club account because she did not like the schedule or the job site location and the requirement that it required her to constantly patrol the apartment facilities."  Defendant's Exh. 2 ¶ 5.  Davis claimed at his deposition that plaintiff "wanted to be removed from [the Renaissance Club] because her daughter was graduating from high school and she had a lot of activities in the evening, and Ms. Williams wanted to be there for her daughter."  Plaintiff's Exh. 6 at 90:13-21.

Sometime in May 2008, plaintiff was the victim of a "carjacking."  Defendant's Exh. 1 at 51:1-19.  As a result, plaintiff's physician told her to take time off to rest, Plaintiff's Exh. 1 at 54:1-11, and she missed a week of work.  Defendant's Exh. 1 at 52:3-21.  Plaintiff

---

[7] Plaintiff also had difficulties with the Renaissance Club management's sudden schedule changes, *id.* at 77:13-21, and explained that she was "dealing with [her] daughter's school, some type of a performance or something of that nature."  *Id.* at 74:18-21.

unsuccessfully attempted to get paid vacation to cover the time off, asserting that the Wackenhut employee handbook suggested that she "should have accumulated some vacation time." Plaintiff's Exh. 1 at 54:14-55:9. At her deposition, plaintiff claimed that, apart from her week of recuperation from the carjacking, she actively sought work with Wackenhut/G4S during the period from April 21, 2008, to July 2, 2008, but none was available. *Id.* at 55:10-56:18. Consequently, she filed for unemployment benefits. *Id.* However, plaintiff "didn't have to use the benefits because [Davis] put [her] back to work." *Id.* at 148:12-15.

In a telephone conversation with plaintiff in July 2008, Davis claimed that Wackenhut/G4S had been trying to reach plaintiff, but "couldn't get in touch with [her]." Plaintiff's Exh. 1 at 58:14-59:1. Plaintiff averred that, during that conversation, Davis told her she "was terminated" and needed to return her "gear and uniforms." *Id.* at 59:2-10. But, when plaintiff arrived at Wackenhut to return the items, he explained that he told her she had been terminated "so that [he] could account for [her] weapon." *Id.* at 60:1-4. Davis offered to send plaintiff out on another job, saying: "I have a site that I need you to do." *Id.* at 59:10-14. According to plaintiff, Davis told her: "[S]ome of these sites I can't send you to because the clients[8] only want male." *Id.* at 60:12-14.

The record reflects that plaintiff resumed work for defendant on July 2, 2008. Plaintiff's Exh. 3, App'x 1. After three temporary shifts, she was assigned to the Red Roof Inn, commencing on July 18, 2008, and ending on August 29, 2008. Plaintiff's Exh. 3, App'x 1. On

---

[8] Plaintiff's recollections of conversations with her supervisors at Wackenhut/G4S refer to "clients" with discriminatory policies; she insists that, in addition to Jai, other Wackenhut/G4S clients had gender restrictions. Plaintiff's Exh. 4 at 3. But, she was unable to name any when asked. Defendant's Exh. 1 at 132:8-18. Paros testified that he was unaware of any other clients in the Baltimore area that indicated a preference for male security guards. Plaintiff's Exh. 3 at 38:21-39:3. Similarly, Ferguson testified that he was not "aware of any other clients who only received male security personnel…." Plaintiff's Exh. 2 at 15:20-16:2.

August 8, 2008 and August 28, 2008, during the course of her work at the Red Roof Inn, plaintiff was asked by a fellow employee, CPO Darrell Blaine, to cover his shifts at Jai.  Plaintiff's Exh. 4 at 5-6.  At her deposition, plaintiff asserted that covering for Blaine would not have interfered with her shifts at the Red Roof Inn, because her shift ended "early in the morning, [when] his shift begins, so all [she] had to do was leave Red Roof and just go to Jai."  Plaintiff's Exh. 1 at 206:15-18.  She called and sent text messages to Davis and Ferguson to "let them know that this is what [she] wanted to do."  *Id.* at 206:8-15.  According to plaintiff, Ferguson denied the request, explaining that "no females [are] allowed" at Jai.  *Id.* at 206:18-20.  Plaintiff complained to Ferguson that "it was discrimination…that Wackenhut continued to take contracts that discriminate against a qualified officer just because she is a female…."  Plaintiff's Exh. 4 at 6.

Ferguson confirmed that plaintiff asked to substitute for Blaine.  He contended that he denied the requests, not because of a gender restrictive policy at Jai, but because "plaintiff was working at [Ferguson's] site, and [he] wasn't having her go to another site to work when she was scheduled for [his]."  Plaintiff's Exh. 2 at 24:2-5.   At his deposition, Paros clarified that Wackenhut/G4S "tr[ies] to eliminate overtime," Plaintiff's Exh. 3 at 73:6, noting that plaintiff was already working full time at Red Roof Inn when Blaine asked her to substitute for him.

On August 25, 2010, a date in between Blaine's two requests for plaintiff to cover for him at Jai, plaintiff submitted a fax to Ferguson and Davis, informing them that she "will be out of town" from "Saturday 8/30/08" to "Monday 9/01/08" and "will return on Tuesday, 9/02/08."  Defendant's Exh. 9.  In 2008, those dates fell over Labor Day weekend.  In her affidavit, plaintiff explains that the fax was merely "a reminder," as she had previously twice informed Ferguson, by telephone, that she needed those days off, and had so informed Davis once.  Plaintiff's Exh. 5 ¶¶ 3-4.  She insists that this "was the standard practice and procedure which [she] had followed

throughout [her] employment," and that she "was never told that this procedure did not comply with Wackenhut policy...." *Id.* ¶ 4.  According to plaintiff, Ferguson told her "O.K. I got you" with respect to her request for leave, *id.* ¶ 3, and she "did not believe that [she] was scheduled to work on either day." *Id.* ¶ 5.

Ferguson maintains that company policy required employees to submit "leave request forms" at least two weeks prior to the proposed dates.  Defendant's Exh. 2 ¶ 7.[9]  He maintains that he denied plaintiff's request because it was submitted only five days prior to the requested dates, and he was "unable to obtain coverage for her over the Labor Day weekend." *Id.* ¶ 9.  He adds that there "wasn't enough time to get her spot covered."  Defendant's Exh. 7 at 36:15-18. Ferguson called Williams to tell her the request was denied. *Id.* at 37:1-2.  Although Ferguson did not recall discussing plaintiff's leave request before her submission of the "reminder" fax, he conceded that the conversations could have occurred.  Plaintiff's Exh. 2 at 33:7-14.

On September 1, 2008, Ferguson received a call from the Red Roof Inn complaining that plaintiff had not reported for work.  Defendant's Exh. 2 ¶ 10.  Thereafter, Ferguson called plaintiff three times, without success. *Id.*  When plaintiff called back, she stated that she was out of town and could not report to work. *Id.*  Despite Ferguson's warnings "that she could be terminated," plaintiff "reiterated the fact that she was not reporting to work over Labor Day weekend." *Id.*  As a result, Ferguson covered plaintiff's shift at the Red Roof Inn. *Id.* ¶ 11.

Ferguson, who claims to have fired employees "two or three times" for "no show no call," Plaintiff's Exh. 2 at 47:11-48:2, recommended plaintiff's termination to Yurchak. Defendant's Exh. 2 ¶ 12.  Instead, Yurchak wanted to suspend plaintiff for three days. *Id.*[10]

---

[9] Neither party has submitted documentation as to the defendant's policy.

[10] In his affidavit, Ferguson asserts that there were other complaints about plaintiff's performance.  Defendant's Exh. 2 ¶ 4.  In particular, he avers that on December 29, 2006,

Accordingly, on September 2, 2008, Ferguson called plaintiff to inform her of her three-day suspension because of the "no show no call," and advised that she would be reassigned to a new site after her return to work. *Id.* ¶ 13. At his deposition, Ferguson vigorously denied that plaintiff reported to the Red Roof Inn on September 2, 2010, claiming he had already notified her of the suspension. Plaintiff's Exh. 2 at 49:1-19. Ferguson indicated that he was "absolutely positive" of these facts. *Id.* at 49:20-21.

Plaintiff's account differs greatly. At her deposition, plaintiff denied receiving the calls from Ferguson and insisted that she was unaware that her vacation request had been refused or that she had been suspended until she arrived for her shift at the Red Roof Inn on September 2, 2010, to begin her normal duties. Plaintiff's Exh. 1 at 142:8-143:1. It was only then that an unidentified "road sergeant" approached her, saying: "[T]hey told me if you're here to send you home, you're suspended for the rest of the week without pay." *Id.* at 142:18 – 143:1. Williams promptly contacted Ferguson, who said: "Williams, you've been suspended, that's all I'm going to say...you're suspended for no call, no show." *Id.* at 143:17-144:2. Plaintiff insists in her Affidavit that she "was never told...that a written request...had to be submitted two weeks early." Plaintiff's Exh. 5 ¶ 4.

Ferguson avers in his affidavit that, after plaintiff's suspension, he attempted to reach plaintiff numerous times by phone, but his calls were neither answered nor returned.

---

Williams was removed as the Comcast Site Supervisor for "providing false statements to supervision and bringing her children to work." *Id.* She was also removed from a placement at Provident Bank on September 25, 2006, "because of her inability and/or unwillingness to follow client instructions." *Id.* ¶ 5. And, he claims that she was removed from Chesapeake Biological Labs on April 24, 2008, because she "was repeatedly late for work...causing the client to complain and ask for her removal from that job site." *Id.* at ¶ 6. Yet, at his deposition, Ferguson stated that he was unaware of any performance problems involving plaintiff at Provident Bank or Chesapeake Biological Labs, Plaintiff's Exh. 2 at 22:10-16, claiming to be aware only of the Comcast and Red Roof Inn incidents. *Id.* at 22:20-23:5; 57:11-15.

Defendant's Exh. 2 ¶¶ 13-16.  He expresses "no doubt" that, had Williams returned his calls, she would have received a work placement and continued to work for Wackenhut/G4S, particularly around the holiday season.  *Id.* ¶¶ 19-20.  Because he did not hear from plaintiff, however, he called, on an unspecified date, to instruct her to return her company-issued weapon.  *Id.* ¶ 15.  Ultimately, he threatened that if she did not return the weapon, he would report the matter to the Maryland State Police.  *Id.* ¶ 16.  On December 8, 2008, Ferguson reiterated that message, and gave plaintiff a deadline of December 12, 2008, to return the weapon.  *Id.*  On December 11, 2008, he and Operations Manager Blevins[11] went to plaintiff's home to recover the weapon, but did not see plaintiff.  *Id.* ¶ 17.  That same day, Williams sent a text message to Ferguson, and she returned her weapon and uniforms the following day.  *Id.*  At that time, Ferguson prepared a "termination sheet" for Williams, noting that she had not worked for G4S for over 90 days and had not contacted Ferguson about scheduling new work during that time period.  *Id.* ¶ 18.

In contrast, Williams alleged that, at the end of the suspension, she called Wackenhut for work, but never received any return calls.  Plaintiff's Exh. 1 at 146:17-20.  Finally, on or about September 15, 2010, she spoke to Ferguson, and was allegedly told that the "suspension led into a termination."  *Id.* at 200:18-201:11.  Minutes later, she spoke to Blevins, who confirmed that she was terminated.  *Id.* at 201:16-21.  According to plaintiff, she made the following statement to Blevins, *id.* at 201:21-202:7:

> [A]re you telling me that I'm terminated for following protocol to take my days off and now I'm being terminated because I took those two days off?...I want to let you know that your staff denied me work sites that were available for me to work but told me that I couldn't work it because I was a female.

Plaintiff recounted Blevins's response: "'[T]his is news to me, I didn't know.'"  *Id.* at 202:9-10.

---

[11] Blevins's surname appears in the record as both "Blevins" and "Bevins," but his first name does not appear in the record.

Plaintiff testified that, on or about September 16, 2010, Ferguson called to inform her that her termination was rescinded, and that Davis would "call [her] with a schedule" for work at Chesapeake Biological Labs.   *Id.* at 202:15-203:8.   Over the course of the following days, plaintiff left "message after message" for Davis and Ferguson, but did not hear back.   *Id.* at 203:9-21.   Finally, she reached Davis by phone "towards the end of the month [of September]," and he told her to "hold tight" and that he would call her back.   *Id.* at 204:1-18.   However, she never heard from Wackenhut/G4S until Ferguson called in December about returning her gun. *Id.* at 204:19-205:2.   In the interim, she obtained unemployment benefits.   *Id.* at 149:10-16.

At his deposition, Ferguson disputed plaintiff's allegations.   The following portion of his testimony is relevant:

> Q. But your testimony here, just to be clear, is Ms. Williams was never at any time fired for no show, no call or not being present at the Red Roof Inn, correct?
>
> A. Correct.
>
> Q. Do you recall a conversation where you initially told Ms. Williams she was fired?
>
> A. No.
>
> Q. Do you recall her then calling operations manager Blevins and complaining about the discrimination?
>
> A. No.
>
> Q. Do you recall calling Ms. Williams back the next day and telling Ms. Williams, for whatever reasons, you're not being fired?
>
> A. The only thing I called her and told her she was suspended for three days, without pay, and that she had to contact me after the three days so we could get her back to work.

Plaintiff's Exh. 2 at 48:3-21.

On December 8, 2008, plaintiff filed a charge of discrimination against Wackenhut with the Maryland Commission on Human Relations.  Plaintiff's Exh. 7, App'x 1.  Wackenhut was notified of the charge by letter dated December 10, 2008.  *Id.*  The letter is stamped as received by defendant on December 16, 2008, *i.e.*, *after* Ferguson terminated plaintiff.  *Id.*

Davis testified that he knew plaintiff had filed the charge.  Plaintiff's Exh. 6 at 67:2-4.  In December 2008 or January 2009, Yurchak asked Davis to prepare a "statement of facts" about plaintiff's termination in order to "assist the company in responding to her charge of discrimination."  *Id.* at 65:14-67:7.  The Statement of Facts described Williams's "work assignments from the months of March 08 thru July 08."  Plaintiff's Exh. 6, App'x 2.  It stated that in April 2008 plaintiff was removed from the Renaissance Club because "she no longer wanted to work at [that] location" and, the same month, "Williams was removed from [Chesapeake Biological Labs], at the request of the client," who cited "repeated lateness, for reason of removal."  *Id.*  With respect to the assignment to train at Jai,[12] Davis wrote that he "explained to CPO Williams that due to client and site requirements, she did not meet the standards for assignment to Jai," because "the client did place restrictions on placing a female officer at Jai."  *Id.*  But, he emphasized that it "was a client policy and not Wackenhut's."  *Id.*

Upon request by Yurchak, Ferguson prepared a similar statement.  But, Ferguson testified that he did not know he was asked to do so in relation to the charges that plaintiff filed against the company.  Indeed, Ferguson insisted he never knew Williams had filed a charge of discrimination.  Plaintiff's Exh. 2 at 40:1-4.  Ferguson reiterated the facts set out above with respect to suspension that resulted from the "no call no show" at the Red Roof Inn on Labor Day

---

[12] The Statement of Facts indicates that the training at Jai occurred in May 2008.  But, the parties agree that it occurred in January 2008.

13

weekend, and stated that plaintiff was terminated in December for failure to contact the company after her suspension, despite Ferguson's attempts to reach her.  Plaintiff's Exh. 2, App'x 1.

On September 15, 2010, the EEOC issued to Williams a "Notice Of Right To Sue." Plaintiff's Exh. 5, App'x 2.  This suit followed.  Additional facts will be included in the discussion.

### Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed. R. Civ. P. 56(c)).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a summary judgment motion, the Court must consider the facts and all reasonable inferences drawn from them in the light most favorable to the nonmoving party.  *Scott v. Harris,* 550 U.S. 372, 378 (2007).  The party opposing summary judgment must demonstrate that there are genuine disputes of material fact so as to preclude the entry of judgment as a matter of law.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opponent must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.*; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts.  *Bouchat v. Balt. Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

When, as here, both parties have moved for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaav*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822, 2003).  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

### Discussion

*Retaliation*

In Count II of the Complaint, plaintiff asserted a claim for retaliation under Title VII. She alleged: "Defendant unlawfully retaliated against Plaintiff for complaining about and opposing unlawful discrimination by suspending Plaintiff without pay and terminating her employment in violation of Title VII." *Id.* ¶ 15.  As noted, defendant moved for summary judgment as to this claim.

"Title VII prohibits an employer from retaliating against an employee who exercises his Title VII rights." *Thorn v. Sebelius*, 766 F.Supp.2d 585, 600 (D. Md. 2011).  *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter").  The purpose of

Title VII's antiretaliation provision is to "[m]aintain[] unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

To establish a claim for retaliation under Title VII, the plaintiff must show that: 1) she engaged in protected activity; 2) the defendant took a material adverse employment action against her; and 3) that a causal connection existed between the protected activity and the adverse action. *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003).

In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff can proceed on a discrimination claim by offering "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (alteration in original) (citations omitted) (internal quotation marks omitted), *cert. denied*, 535 U.S. 933 (2002).

Alternatively, a plaintiff lacking direct evidence of discrimination may proceed under the burden shifting approach popularly known as the *McDonnell Douglas* proof scheme. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production" as to a claim of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981)

("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").   Notably, "the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by."   *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring).   Indeed, the purpose of the prima facie case requirement is to assist the plaintiff in surmounting two common "evidentiary obstacles": (1) that "'direct evidence of discrimination is likely to be unavailable'"; and (2) that "'the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote'" the employee.   *Smith v. Univ. of North Carolina at Chapel Hill*, 632 F.2d 316, 334 (4th Cir. 1980) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)).

A plaintiff must first establish a "prima facie case" of discrimination, by a preponderance of the evidence.   *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). The precise formulation of the required prima facie showing will vary in "different factual situations."   *McDonnell Douglas*, 411 U.S. at 802 n.13.   But, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253 (1981).

In order to establish a prima facie claim of retaliation under Title VII, a plaintiff "must show that [s]he engaged in protected activity, that [her employer] took adverse action against [her], and that a causal relationship existed between the protected activity and the adverse employment activity."   *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).   *Accord Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010), *aff'd,* ___ U.S. ___, No. 10–

1016, 2012 WL 912951 (Mar. 20, 2012); *Beall v. Abbott Laboratories,* 130 F.3d 614, 619 (4th Cir. 1997).  In the retaliation context, under the *McDonnell Douglas* proof scheme, the causal connection prong may be proved circumstantially.  *Peters,* 327 F.3d at 321.

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action or differential treatment.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Burdine,* 450 U.S. at 253; *Merritt,* 601 F.3d at 294.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted."  *Burdine,* 450 U.S. at 255.  In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture."  *Hicks*, 509 U.S. at 510-11.  Put another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant."  *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

When the defendant meets its burden, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," but was, instead, a pretext for discrimination, and that the plaintiff "has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 253, 256; *see Hoyle, supra,* 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino,* 446 F.3d 541, 551 (4th Cir. 2006)).  Notably, under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from the plaintiff" to prove intentional unlawful discrimination.  *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

As indicated, the plaintiff must establish that she engaged in protected activity. As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied,* 547 U.S. 1041 (2006). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998).

Protected oppositional activity "may include 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities,' as well as 'complain[ts] . . . about suspected violations'" of Title VII. *Navy Federal Credit Union*, 424 F.3d at 406 (internal citations omitted). As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause…behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 47 F.2d 441, 448 (4th Cir. 1981) (citation omitted), *accord Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001); *Laughlin, supra,* 149 F.3d at 259. "Complaining about discriminatory treatment relating to a protected class is protected under the opposition clause of § 2000e–3(a)." *Volochayev v. Sebelius*, No. 11–cv–00230–AW, 2011 WL 4747898, *10 (D. Md. Oct. 5, 2011).

As to the second element of a retaliation claim, an adverse employment action is one that "'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (alteration in original) (citation

omitted).  In *Hoyle*, *supra*, the Fourth Circuit said:  "An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  50 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see Boone v. Goldin,* 178 F.3d 253, 255 (4th Cir. 1999) (noting that adverse employment actions have been found in cases involving, *inter alia*, discharge, demotion, or diminished opportunities for advancement).  "In addition, [a plaintiff] 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Hoyle,* 650 F.3d at 337 (quoting *Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (internal quotation marks omitted)).  Like termination, "suspension without pay can be a materially adverse action."  *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F. Supp. 2d 500, 516 n.27 (D. Md. 2011) (citing *Burlington*, 548 U.S. at 72-73).

"To satisfy the third element," a causal connection between the protected activity and the adverse action, a plaintiff must show that "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity."  *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original).  "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."  *Id.  Accord Bonds v. Leavitt*, 629 F.3d 369, 383 (4th Cir. 2011); *Cherry v. Bealefeld*, No. CCB-08-1228, 2010 WL 917421, *7 (D. Md. Mar. 9, 2010).

The Fourth Circuit "has held that evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Dowe, supra,* 145 F.3d at 657 (quoting *Williams, supra,* 871 F.2d at 457) (emphasis and alterations in *Dowe*).  Conversely, "the opposite [is] equally true," so that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action…negates any inference that a causal connection exists between the two." *Dowe,* 145 F.3d at 657 (finding a period of time exceeding three years too lengthy to give rise to the inference of a causal connection). *Compare Williams,* 871 F.2d 452 (less than four months sufficiently close in time to support the inference); *see also Carter v. Ball,* 33 F.3d 450, 460 (4th Cir. 1994) (two incidents of protected activity ten and five months, respectively, prior to the adverse action "sufficient to establish a *prima facie* case of retaliation under *Williams*").

Defendant does not dispute that, if Williams indeed complained of discrimination, such complaints would constitute protected activity.  Nor does defendant dispute that suspension and termination are adverse employment actions.  However, with respect to the third prong, defendant argues that Williams has "failed to produce any evidence capable of supporting a finding that her alleged complaints regarding discrimination by a G4S client were causally connected to her suspension and subsequent termination." Memo at 1.  Therefore, it contends that it is entitled to summary judgment.

In defendant's view, Williams has not demonstrated that the stated reasons for suspension and termination were pretextual.  It asserts: "Williams has offered no evidence, apart from her own speculation, in support of her allegation that disciplinary action based on her failure to appear for work was unfounded, and the undisputed evidence confirms that she failed to comply

with G4S's policy for leave requests." *Id.* at 9.   Moreover, defendant argues that the adverse action and protected activity were not sufficiently related in time so as to give rise to the inference of a causal connection, asserting: "Williams' suspension did not occur until more than seven months after she alleges she first complained about discrimination by one of G4S's clients." *Id.* at 9-10.

Defendant concedes that plaintiff also complained of discrimination after the rejection, on August 28, 2008, of her request to substitute for Officer Blaine, which was just days before her suspension on September 2, 2008. *Id.* at 10.   But, defendant asserts, *id.*:

> This does not serve to rescue Williams' claim, however, as she offers no explanation whatsoever as to why, after taking no adverse action for more than seven months after Williams' complaint about Jai Medical Center, G4S would suddenly choose to retaliate when Williams made the same complaint in reference to being unable to work a single shift as a substitute.

Plaintiff counters: "The evidence in this case is clearly sufficient to establish a prima facie case" of retaliation.   Response at 22.   She insists that her complaints constituted protected activity, and that the suspension and termination constituted adverse actions. *Id.* at 23.   With respect to causal connection, plaintiff argues that "the close proximity between the events, by itself, establishes a prima facie case of causation." *Id.* at 24 (citing *Williams, supra,* 871 F.2d 452).   Williams observes, *id.* at 24-25:

> Plaintiff was suspended five (5) days after she complained to Ferguson, and was 'officially' discharged less than three months after she complained to the Operations Manager[, Blevins].   The fact that Williams did not receive a single work assignment (despite repeatedly requesting work) during the three month period after she was allegedly reinstated is also compelling evidence of retaliation.   A reasonable jury could find that Williams was effectively terminated in September, 2008, that Wackenhut never intended to bring Plaintiff back to work, and the termination was part and parcel of the sham reinstatement.

In response to defendant's argument that Williams had complained of the same conduct months earlier without apparent reprisal, plaintiff notes that her earlier complaints were directed

towards Davis, who was not involved in the decision to suspend her, whereas her later complaints were directed towards Ferguson, who was unaware of the earlier complaints and testified that he did not believe Jai's policy was discriminatory, which might have made him "less receptive" to Williams's complaints. *Id.* at 25.

Further, Williams asserts that the record supports a finding of pretext. She argues that the given reason for the suspension, the "no show/no call," was pretextual because she had permission to miss work, and had complied with the leave procedure as she knew it to be and as she had done, without objection, in the past. *Id.* at 26-27. Similarly, she asserts that "a reasonable jury could find that Defendant's claim that Williams was fired for not working and failing to contact her supervisors is both false and pretextual," because, contrary to defendant's assertions, plaintiff *did* contact Wackenhut/G4S repeatedly after the suspension ended, as discussed, *supra. Id.* at 27-29.

In its Reply, defendant reiterates that "Williams has failed to produce any evidence capable of establishing a causal connection between her alleged protected activity and G4S' alleged retaliatory acts," and that "Williams has failed to rebut the legitimate nondiscriminatory reasons offered by G4S with regard to her suspension and termination." Reply at 5. With respect to the matter of pretext, defendant argues that "Williams' own lack of awareness of the [vacation time] policy…does not act to excuse her noncompliance or otherwise support an assertion that G4S' enforcement of its policy was pretextual." *Id.* at 6. With respect to the termination, defendant acknowledges that, according to Williams's version of events, she had attempted to contact Wackenhut/G4S over the 90 days defendant claims she was non-responsive, but notes that "she never actually appeared at the G4S office" during that time. *Id.* at 6.

Defendant also argues that Williams's claim that she continued to reach out to Wackenhut/G4S is belied by the fact that she had, at the time, "filed for unemployment compensation." *Id.* at 7.

In my view, plaintiff has established a prima facie case of retaliation under Title VII. It is undisputed that she engaged in protected activity, *i.e.* lodging complaints about sex discrimination, and that she suffered adverse employment actions, *i.e.* suspension and termination. Moreover, a jury could conclude that the adverse actions were temporally related to the protected activities, so as to indicate a causal link between the protected activity and the adverse employment actions.

As discussed, "evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Dowe, supra,* 145 F.3d at 657 (citation omitted) (emphasis in original). The period of seven months between plaintiff's first complaint about Jai and her suspension is not so long as to make the inference inapplicable, even if the relationship between plaintiff and defendant was "business as usual" during that period. *See, e.g., Carter, supra,* 33 F.3d at 460 ("Carter filed several EEO complaints, including one on September 26, 1988 and another on February 9, 1990, thus engaging in a protected activity….The decision to downgrade him had an effective date of July 29, 1990. These facts are sufficient to establish a *prima facie* case of retaliation under *Williams.*"). In any event, the seven month period is not as relevant as the *five day* period between plaintiff's complaint about Jai on August 28, 2008, and her suspension on September 2, 2008.

I am not persuaded by defendant's argument that her complaint to Ferguson in August 2008 and the suspension in September 2008 could not be causally related, because plaintiff was not disciplined after she first complained to Davis in January 2008. As plaintiff explains, Davis

and Ferguson could have reacted differently to accusations of discrimination, particularly in light of Ferguson's apparent hostility to plaintiff's claim that Jai's policy was discriminatory. Moreover, an employer's reaction might change in the face of an employee's repeated complaints.

In addition, the period of three months between plaintiff's accusations of discrimination to Blevins on September 15, 2008,[13] and plaintiff's December 2008 termination, is sufficiently close in time to satisfy the standard. *See Williams, supra,* 871 F.2d at 457 (three months deemed sufficient). Moreover, a reasonable jury could adopt plaintiff's position that she was "effectively terminated in September, 2008," the time when she stopped receiving assignments from Wackenhut/G4S, and the temporal relationship would then be even closer. Response at 25.

In sum, there was not such a "lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action" so as to "negate[] any inference that a causal connection exists between the two." *Dowe,* 145 F.3d at 657. The inquiry does not end here, however.

As noted, "[i]f a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle,* 650 F.3d at 337 (citation omitted). Here, defendant has put forward legitimate non-discriminatory reasons for plaintiff's suspension, based on the "no show/no call" policy, and for her termination in December 2008, based on plaintiff's alleged failure to contact Wackenhut/G4S for 90 days following her suspension.

---

[13] Ferguson denied that plaintiff spoke with Blevins. Plaintiff's Exh. 2 at 48:3-21. But, at this juncture, the Court must credit plaintiff's account.

"In the summary judgment context, once a plaintiff has established a prima facie case, and the defendant has enunciated a legitimate nondiscriminatory explanation, the plaintiff must come forward with sufficient evidence for a jury to conclude that the employer's justification is merely a mask for impermissible discrimination." *Moore v. Reese*, 817 F.Supp. 1290, 1295-96 (D. Md. 1993). Plaintiffs "can meet their burden of proving pretext either by showing that [the employer's] explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of…discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (citing *Burdine*, 450 U.S. at 256; *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002)).

"The general standards for summary judgment naturally inform any assessment of whether a plaintiff has provided sufficient evidence of pretext such that her case may proceed to trial….[S]ummary judgment is appropriate when 'there is no genuine issue as to any material fact and...the moving party is entitled to a judgment as a matter of law.'" *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006). Put another way, at the summary judgment stage, a plaintiff need only present enough evidence of pretext that a reasonable jury could find in her favor. *See, e.g., Okoli v. City Of Baltimore*, 648 F.3d 216, 228 (4th Cir. 2011) ("[B]ecause a jury could credit [plaintiff's] evidence indicating that [her employer's] proffered reasons were pretextual,…it should be for the jury to determine whether the…nondiscriminatory reasons were the true motivation for [plaintiff's] termination."); *Wesley v. Arlington Cnty.*, 354 F. App'x 775, 782 n.9 (4th Cir. 2009) ("[W]e must…not invade the province of the jury and weigh the credibility of witnesses and evidence on contested issues of fact. We make no ultimate judgment on whether the reasons offered by the [employer] are pretextual. Instead, reviewing the limited and contradictory evidence in the record in the light most favorable to [plaintiff], we only hold

that a reasonable jury could reach such a conclusion."). *See also Lettieri v. Equant Inc.*, 478 F.3d 640, 649 (4th Cir. 2007) ("To this point, [plaintiff] has made out a prima facie case of sex discrimination and offered ample evidence to discredit [her employer's] proffered nondiscriminatory reason for her termination. Because [her employer] has not offered 'uncontroverted independent evidence that no discrimination [ ] occurred,' [plaintiff's] showing is sufficient to permit a 'trier of fact to infer the ultimate fact of [intentional] discrimination from the falsity of the employer's explanation.'") (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000) (some alterations in *Lettieri*)).

With respect to the suspension based on the "no show/no call," plaintiff unequivocally asserts that she had permission to miss work on the days at issue, and followed the regular practice as to leave requests. Notably, "[a]n employer may enforce generally applicable employment policies against its employees without creating a cause of action for retaliation." *Wells v. Gates*, 336 F. App'x 378, 385 (4th Cir. 2009). But, in light of plaintiff's assertion, under oath, that defendant only enforced the policy after she engaged in protected activity, a reasonable jury could determine that the employer's conduct was retaliatory, based on its selective enforcement of and retraction of permission to deviate from the leave policy.

As to the termination, plaintiff is equally adamant that she actively sought work with Wackenhut/G4S after her suspension. Again, the Court must construe all disputed facts in favor of the plaintiff and accept her account that she contacted Wackenhut/G4S during this time.[14] Moreover, a reasonable jury could credit plaintiff's account, and find that defendant's claim that

---

[14] That plaintiff failed to go to Wackenhut/G4S in person does not diminish the relevance of her alleged calls to Wackenhut/G4S. Nor is it dispositive that plaintiff applied for unemployment benefits at this time. Recipients of unemployment benefits must actively seek work.

plaintiff failed to contact the company is an explanation "'unworthy of credence.'" *Mereish*, 359 F.3d at 336 (citations omitted).

In sum, a reasonable jury could find that defendant's reasons for plaintiff's suspension and termination were pretextual. Given the genuine disputes of material fact, it would be wholly inappropriate to grant summary judgment to defendant. Accordingly, defendant's motion for summary judgment as to plaintiff's retaliation claim (Count II) is denied.

*Gender Discrimination*

Plaintiff has also asserted a claim for sex discrimination under Title VII (Count I), alleging that "Plaintiff was treated less favorably than male Custom Protection Officers, who were not precluded from working at available work sites based on their sex, were assigned to work at such sites by Defendant Wackenhut, and were not discriminated against in the terms and conditions of their employment based on their sex, male." Complaint ¶ 11. As to this claim, the parties have filed cross motions for summary judgment.

As indicated, a plaintiff may prove intentional employment discrimination at trial by offering "direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). In that circumstance, "the *McDonnell Douglas* test is inapplicable...." *Thurston*, 469 U.S. at 121. *See also EEOC v. Lockheed Martin Corp.*, 444 F. Supp. 2d 414, 420 n.7 (D. Md. 2006) ("The EEOC has proffered direct evidence of retaliation; therefore, the familiar burden-shifting analysis of *McDonnell Douglas* [], which permits a plaintiff to establish a rebuttable presumption that an employer's conduct was discriminatory, is inapposite."); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 325 (D. Md. 2003) (finding that "resort to the *McDonnell Douglas* scheme of proof is unnecessary," as plaintiff had "adduced sufficient direct evidence of intentional racial discrimination").

28

Plaintiff insists that she has presented "direct evidence" of discrimination.  *See* Response at 13.  In its Motion, defendant does not address the *McDonnell Douglas* framework, recognizing that plaintiff was subject to a facially discriminatory policy by Jai.  *See* Memo at 6 ("Williams' claim for sex discrimination rests…on the *fact* that Jai…expressed an intention to G4S not to accept the assignment of female security guards to its facilities.") (Emphasis added).

In *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the showing that is required to withstand summary judgment via ordinary principles of proof:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.,* 193 F.3d 219, 232 (4th Cir.1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action. *See Brinkley* [*v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999)] ("To survive summary judgment on the basis of direct and indirect evidence, Brinkley must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action.").

Defendant claims the protection of "two...defenses."  *Thurston*, 469 U.S. at 122.  I will discuss each one, in turn.

First, defendant insists that plaintiff has "identified no adverse employment action capable of supporting her discrimination claim."  Memo at 1.  As noted earlier, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion."  *Boone v. Goldin*, *supra*, 178 F.3d at 255.  Defendant argues, Memo at 6 (citations omitted):

> [N]o openings existed under G4S's contract with Jai at the time Williams underwent training at Jai's facilities or at any other time during the remainder of her employment with G4S.  While Jai asked that Williams be removed from the training program, this had no impact on her work schedule with G4S, as completion of the training program would not have led into an assignment at Jai

Medical Center….As Jai's alleged discriminatory policy did not itself result in any tangible economic harm to Williams, she cannot state a claim for discrimination on the basis of that policy.

Second, defendant argues that it is not liable to plaintiff because it was *Jai* that maintained the discriminatory policy. Memo at 1. According to defendant, it could not force Jai to accept a female guard and, even if G4S had cancelled its contract with Jai, plaintiff still would not have received a position at Jai. *Id*. at 8.

In its Reply, G4S reiterates that, even if it abided by Jai's request for male guards, it is not liable for discrimination. Defendant argues, *id.* at 1-2:

> Williams…fails to meaningfully address the fundamental defect in her claim of sex discrimination, namely that the alleged discriminatory acts were not committed by G4S and were entirely outside of G4S' control. Specifically, Williams does not dispute the fact that she was sent for training at Jai Medical Center by G4S, but that Jai refused to permit her to work in its facility. Williams likewise has offered no evidence to dispute the fact that as a contractor of Jai Medical Center, G4S' personnel can only enter Jai facilities with that entity's consent. Given that Jai indisputably informed G4S that it would not permit Williams to work at its facility, and G4S had no contractual right to override that decision, it is entirely unclear how G4S—as opposed to Jai—discriminated against Williams, or what G4S could have done to improve Williams' position.

In contrast, plaintiff contends that she has presented "direct evidence" of discrimination, and is thus entitled to summary judgment. Response at 13. She argues, *id.* (citations omitted):

> G4S admits that Jai placed 'restrictions on [its] placing a female officer' at Jai, that it summarily removed Williams from Jai's worksite based upon her sex, that G4S has knowingly continued to assign large numbers of male employees to Jai based upon its client's preference, and it failed to provide any work assignments to Williams for weeks and/or months at a time.

In opposing defendant's summary judgment motion, plaintiff maintains that she was subjected to an adverse employment action. In her view, "the evidence does not support Defendant's assertion that Jai was a short term, one time training assignment." *Id.* at 16. Rather, she maintains that she "was removed from a regular, full-time and well-paid position…based on

her sex." *Id*. Pointing to the minimal hours and sporadic assignments that characterized her employment with Wackenhut/G4S in 2008, plaintiff observes: "The tangible adverse impact of Defendant's decision to remove Williams from a regular, full-time job assignment, based on her sex, is readily apparent to everyone except G4S." *Id*. at 17. She concludes: "A reasonable jury could find that, but for her sex, Williams would have been working a regular schedule at Jai throughout this period." *Id*.

Plaintiff also challenges defendant's contention that it is not liable for any discrimination by Jai. She asserts: "[A]n employer does not eliminate its own responsibilities under Title VII simply by claiming that its own discrimination is 'the client's policy, not Wackenhut policy.'" *Id*. at 14 (citation omitted). In addition, plaintiff observed that sex was not a bona fide occupational qualification ("BFOQ") for work at Jai. *Id*. at 14.[15]

Preliminarily, I reject defendant's claim that it is entitled to summary judgment on the ground that plaintiff did not sustain any adverse employment action, as there were no opportunities to work at Jai in 2008, regardless of gender. There is a clear dispute of fact regarding this matter.

In support of its assertion that there were no openings at Jai, defendant points to Ferguson's affidavit, in which he states, as noted:

> There were no openings for any full-time or part-time positions at [Jai] during 2008. The only purpose for having Williams receive training at that site would be in the event that there was an occasional need for an officer to cover that site when all of the full-time and part-time officers were unavailable.

---

[15] The BFOQ is a "narrow" defense which permits an employer to "'discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is…reasonably necessary to the normal operation of that particular business or enterprise.'" *Automobile Workers v. Johnson Controls*, 499 U.S. 187, 200-01 (1991) (quoting 42 U.S.C. § 2000e-2(e)(1)). Defendant does not assert that sex was a BFOQ for working at Jai.

Defendant's Exh. 2 at ¶ 1.[16]

Defendant also relies on the testimony of Ferguson, Plaintiff's Exh. 2 at 24:2-5, and

contends, Memo at 7:

> The only potential lost assignments at Jai which Williams has identified consist of one to two shifts for which a fellow employee asked Williams to cover his assignment.  As explained by Ferguson, however, Williams was refused those shifts due to the fact that she was already assigned a full-time schedule another [sic] G4S client at that time.

Plaintiff insists, however, that she was told that Jai was going to be her "regular job

assignment."  Plaintiff's Exh. 5 ¶ 1.  She points to the "List of Employee's [sic] Assigned to Jai

Medical Center From January 1, 2008 – September 30, 2008," which shows seven employees

_____

[16] At his deposition, Ferguson answered in the affirmative when asked the following question: "Was there any turnover in the male employees assigned to Jai Medical Center during the term of your employment?"  Plaintiff's Exh. 2 at 30:7-10.  Noting the discrepancy, plaintiff asserts that the Court "should disregard Ferguson's inconsistent testimony and sham affidavit." Response at 19.  In support of her position, plaintiff also cites to discrepancies between Ferguson's affidavit and deposition testimony with respect to plaintiff's performance at Provident Bank and Chesapeake Biological Labs, discussed *supra,* n.10.

The Fourth Circuit adopted the "sham affidavit rule" in *Barwick v. Celotex Corp.,* 736 F.3d 946, 960 (4th Cir. 1984), reasoning that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiffs testimony is correct."  Later, in *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806 (1999), the Supreme Court provided the following formulation of the sham affidavit rule: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."

I am not persuaded that Ferguson's deposition testimony is a "flat contradiction" of his affidavit.  Ferguson's employment with Wackenhut/G4S was not limited to 2008.  Therefore, the assertion that there was turnover during the term of his employment does not necessarily contradict his assertion that there was no turnover in 2008.  As to the discrepancies regarding Provident Bank and Chesapeake Biological Labs, because neither plaintiff nor defendant relies on plaintiff's performance with these clients, the discrepancy is not material.

To be sure, there are some discrepancies between Ferguson's deposition and his affidavit, and these may be fruitful avenues of cross-examination at a trial.  In my view, however, none of them is so stark as to justify invocation of the sham affidavit rule.

with dates of employment at Jai commencing in 2008.  Plaintiff's Exh. 8.[17]  In addition, plaintiff disputes that she was denied Officer Blaine's shifts at Jai because she was working at the Red Roof Inn, insisting that she was told she could not cover the shifts at Jai because of her gender. Response at 17-18.  And, she notes that there were other opportunities for "fill in" work at Jai in 2008, apart from the shifts offered by Blaine, but she was not permitted to work there due to her gender.  *Id.* at 17.[18]  Further, she maintains that defendant "improperly limits its analysis to Jai during the period from January, 2008 to September, 2008," claiming that she may have been precluded from opportunities at Jai prior to 2008, or from working for other clients that may have had similar gender restrictive policies throughout her employment.  *Id.* at 18.

Although defendant claims plaintiff was not deprived of work, and thus did not suffer an adverse employment action, defendant does not dispute that deprivation of work constitutes an adverse employment action.  *See Ware v. Potter*, 106 F. App'x 829, 831 (4th Cir. 2004) ("If the employer denied [plaintiff] a single temporary promotion for impermissible reasons, that would be an actionable adverse employment action regardless of whether the employer offered [plaintiff] different promotion opportunities at other times.").  Moreover, it is obvious that there are genuine disputes of material fact regarding the availability of work at Jai and elsewhere, and the extent to which plaintiff was precluded from working at Jai because of her gender. Construing the facts in the light most favorable to plaintiff, a jury could conclude that Williams suffered an adverse employment action.

I also reject defendant's contention that it would be entitled to summary judgment if it merely carried out Jai's policy, but did not itself engage in discrimination.  In support of its

---

[17] In its Reply, defendant does not respond to plaintiff's statements regarding that document.

[18] Plaintiff bases this assertion on the fact that Davis worked at Jai in 2008, and he only worked at client sites when a substitute could not be found.  *Id.*

position that it should not be liable for Jai's conduct, defendant cites three cases, all of which are distinguishable from the case at bar.  None persuades me to adopt defendant's viewpoint.

In *Barone v. Hackett*, No. 81-0090P, 1982 WL 401, *1 (D. R.I. May 20, 1982), an unreported opinion, the plaintiff sued both her employer and the Director of the Rhode Island Department of Employment Security, the official who was responsible for administering Rhode Island's Temporary Disability Insurance ("TDI") program.  The plaintiff claimed that she would have been entitled to substantially more in disability benefits if her disability had resulted from a condition other than pregnancy, which she viewed as discrimination on the basis of sex.  *Id.*  The court awarded summary judgment in favor of the employer, due to the "limited role it played in the state TDI program."  *Id.* at *4.  It reasoned that plaintiff's employer "did not treat plaintiff differently from other similarly situated employees in carrying out its functions under the program," as it "withheld the same amount of contributions from the plaintiff's wages that it did for similarly situated males and nonpregnant females," which was the extent of its duties.  *Id.*

It is unclear how *Barone* is instructive with respect to the case at bar, but for the following quote, which defendant includes in its Reply, divorced from any context, *id.* at *7: "Title VII cases have repeatedly held that an employer may not be held liable for the actions of a third party over which the employer has no control."  But, in the case *sub judice*, it is the actions of Wackenhut/G4S itself that are at issue, not only those of the third party, Jai.

Construing the facts in the light most favorable to plaintiff, Wackenhut/G4S *did* participate in Jai's maintenance of its discriminatory policy by adhering to it; it purposely assigned only males to Jai, while funneling plaintiff to other sites that were arguably less desirable.  In contrast, Barone's employer had no choice but to participate in the state TDI

program, and had no control over the state's allocation of the funds; that case is thus factually

distinct from the case at bar.  As plaintiff observes in her Surreply, at 4:

> G4S has voluntarily, actively and systematically participated in discriminatory
> assignments practices [sic] based on its employee's sex and continues to do so
> today.  (It certainly was not compelled to do so by state law.)  Since it is
> undisputed that G4S failed to take any corrective action (or even discuss its
> obligations as an employer under Title VII or the legality of its client's
> discriminatory job requirement with the medical clinic), it cannot even
> demonstrate that its systematic discrimination was compelled by an inflexible
> client requirement.  In any event, G4S is liable because it continued to honor its
> client's discriminatory assignment requests, and, therefore, 'actively participated'
> in the discrimination against its own employees.

Defendant also cites *Williams v. Evangelical Retirement Homes of Greater St. Louis*, 476

F. Supp. 440 (E. D. Mo. 1979), which is factually dissimilar, and consists of an opinion that is

just one page.  Plaintiff Andrew Williams, an African American, was employed as a cook at

Friendship Village, a nursing and retirement home, which had a contract with Food Service

Management, Inc. ("Food Service"), pursuant to which Food Service supervised Friendship

Village's employees, including Williams, and provided the site's food and recipes.  *Id.* at 441.

Williams was supervised by Food Service employee Robert Fortel, over whom Friendship

Village had no control.  *Id.*  Plaintiff requested that Food Service promote him to the position of

manager, which would require him "to quit his position with Friendship Village" and become a

Food Service employee, like Fortel.  *Id.*  But, Williams was told that he was unqualified for the

position, and was later terminated by Fortel for unsatisfactory performance.  *Id.*  Friendship

Village, however, signed reports indicating that, in its view, Williams's performance was

"good," and recommended Williams for reemployment.  *Id.*

Williams "entered into a conciliation agreement with Food Service," and brought suit

against Friendship Village.  *Id.*  In dismissing the suit, the court said, *id.*:

There is no evidence to show that the plaintiff's discharge had any connection with the fact that he was black.  He was replaced by another black cook and the reasons for his discharge were because of his clash with Fortel of Food Service, his failure to follow recipes, his tardiness, and his leaving the premises without permission.

However, the court also observed that "Plaintiff's charge of failing to promote him to a food service manager because he was black can only be asserted against Food Service [], since the managers were under their exclusive control…."

Presumably, defendant relies on the fact that the *Williams* court determined that Friendship Village was not liable for any discriminatory conduct of Food Service.  But, the court found that there was no discrimination on the part of Food Service, and Friendship Village had no control over or involvement with Food Service's hiring decisions.

In my view, *Williams* has no bearing on this case.  As plaintiff observes, Surreply at 5:

Plaintiff did not independently apply for separate employment at Jai.  To the contrary, G4S assigned her to work at Jai as a G4S employee, removed her from the worksite based on her sex, knowingly discriminated against Plaintiff (and other female employees) by repeatedly refusing her requests to be assigned to work at Jai, and continued to make discriminatory assignments to Jai.  There is no genuine dispute of material fact with respect to whether G4S employees are under the exclusive control of Jai.

So to with the third and final case defendant cites in support of its position that it is not liable for Jai's discriminatory conduct, *Roberson v. Alltell Information Services,* 373 F.3d 647 (5th Cir. 2004).  In its Reply, at 4, defendant described *Roberson* in a parenthetical, as follows: "explaining that customer decided whether to accept an employee for particular assignment; therefore, the employer did not make the employment decision challenged by the plaintiff."

In *Roberson,* plaintiff accused his employer, Alltel Information Services ("Alltel"), of discriminating against him on the basis of race, sex, and age with respect to a company-wide reduction-in-force, pursuant to which Roberson was terminated.  *Id.* at 650.  The trial court found

that Alltel's adverse employment decision was not motivated by discriminatory animus, as the record "clearly indicate[d] that Alltel's reduction-in-force was based on objective criteria." *Id.* at 652. The court granted summary judgment to the defendant, and on appeal, plaintiff argued that a "cat's paw" analysis should be applied to decisions made by the Alltel employee responsible for selecting the employees for termination "because she was influenced by others who harbored discriminatory animus," namely Roberson's supervisor. *Id.* at 653. Roberson insisted that his supervisor "discriminated in choosing the employees that would receive e-skills training and funded assignments, both of which were objective criteria in the reduction-in-force list." *Id.*

"Funded assignments" were those for which Alltel clients paid for hours worked by Alltel employees, as opposed to "unfunded assignments," which "benefit the company but generate no revenue." *Id.* at 650 n.1. Funded assignments were allocated to Alltel employees by a process in which "Alltel collects the resumes of employees with the requisite skill set and sends those resumes to the client." *Id.* Then, "the client decided when to take on an Alltel employee and which employee would be hired." *Id.* at 654. Accordingly, as the court observed, "whether assignments were funded or unfunded was a decision made by Alltel's customers, *not* by Alltel or [plaintiff's supervisor]." *Id.* at 653-54 (emphasis in original). As plaintiff offered "no evidence, save for his subjective opinion, that [his supervisor] discriminated in assisting his pursuit of funded assignments," and "did not select who received e-skills training," the court affirmed the trial court's grant of summary judgment to the defendant. *Id.* at 654.

Defendant's parenthetical statement did not capture the essence of *Roberson*. First, there was no allegation that Roberson failed to receive funded assignments based on discrimination by Alltel's clients. Second, there was no allegation that Roberson's supervisor discriminated against him in order to fulfill some discriminatory purpose on behalf of Alltel's clients; in fact, it

was held that there had been no discrimination at all.  Rather, Roberson claimed, incorrectly, that his supervisor was responsible for allocating funded assignments, and the court corrected that misapprehension.

In sum, the three cases cited by defendant are inapposite.  G4S is mistaken in suggesting that it could comply with its client's discriminatory "policy," without legal consequence.

Courts have repeatedly held employers responsible for discrimination against their employees, even when the employer itself claimed to be free of bias.  For example, in the context of the BFOQ,[19] courts have repeatedly held that "customer preference" does not excuse an employer's intentional discrimination against its employees.  *See, e.g.*, *Hylind v. Xerox Corp.*, 380 F. Supp. 2d 705, 713 (D. Md. 2005) ("Customer preference as to the gender of a company's employees is not ordinarily considered a *bona fide* occupational qualification (BFOQ)") (citing *Diaz v. Pan American World Airways,* 442 F.2d 385, 389 (5th Cir.) ("a BFOQ ought not be based on 'the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers.'") (citation omitted), *cert. denied* 404 U.S. 950 (1971)); *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) ("It is now widely accepted that a company's desire to cater to the perceived…preferences of its customers is not a defense under Title VII for treating employees differently….").

Indeed, the plain text of Title VII prohibits the construction advanced by defendant.  With respect to "Employment Agency Practices," 42 U.S.C. § 2000e-2(b) states:

> It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

---

[19] As noted, *supra,* n.15, defendant has not argued that being male was a BFOQ for working at Jai.

38

An "employment agency" refers to "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." 42 U.S.C. § 2000e(c). "An employment agency that also is an employer within the meaning of [Title VII] is prohibited from discriminating in its employment practices with respect to its own employees," and "an agency's discrimination against its own employees concomitantly may give rise to unlawful discrimination in its function as an employment agency." Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions,* ¶ 21.10[C], at 21-127—28 (Matthew Bender & Co. 2009).

A staffing firm, like defendant, "may be an employment agency under the Title VII definition," and if the agency/firm's relationship with the workers it places is a continuing one, an employee may "bring a Title VII claim against the staffing firm under theories in addition to those which are applicable to traditional employment agencies." Larson, Employment Discrimination, Ch. 36, Employment Agencies, § 36.01 (Matthew Bender). Complying with the discriminatory policies of a client or customer of the agency/firm will expose the agency/firm to liability. For example, "if an agency receives a job order containing an unlawful sex specification and proceeds to fill the job order, it shares the employer's guilt if it knows of the illegality." *Id*. at § 36.04[1].

"To explain who can be held liable when a contingent worker experiences discrimination, the EEOC has issued an Enforcement Guidance…." Labor and Employment Law, Ch. 53, Title VII Coverage, §53.13 (Matthew Bender).[20] That Enforcement Guidance, released on December

---

[20] "The term 'contingent workers' generally refers to workers who are outside an employer's 'core' work force, such as those whose jobs are structured to last only a limited period of time, are sporadic, or differ in any way from the norm of full-time, long-term employment." Guidance at 1. It includes "those who are hired and paid by a 'staffing firm,'

3, 1997, is titled: "The Application of EEO Laws to Contingent Workers Placed by Temporary Agencies and Other Staffing Firms" (the "Guidance").  Although it is not controlling authority, the Guidance is part of "a 'body of experience and informed judgment' to which we may resort for guidance."  *Clackamas Gastroenterology Assoc. P.C. v. Wells*, 538 U.S. 440, 449 n.9 (2003) (citation omitted).  The Guidance, directed at "firms that hire workers and place them in job assignments with the firms' clients," *id.* at 2, states, unequivocally: "A staffing firm is obligated, as an employer, to make job assignments in a nondiscriminatory manner."  *Id.* at 16.

The Guidance considered the following question: "If a worker is denied a job assignment by a staffing firm because its client refuses to accept the worker for discriminatory reasons, is the staffing firm liable?"  *Id.*  The EEOC concluded, *id.*:

> The staffing firm is liable for its discriminatory assignment decisions….The fact that a staffing firm's discriminatory assignment practice is based on its client's requirement is not a defense.  Thus, a staffing firm is liable if it honors a client's discriminatory assignment request or if it knows that its client has rejected workers in a protected class for discriminatory reasons and for that reason refuses to assign individuals in the protected class to that client.

The EEOC provided the following example to demonstrate that the staffing firm may be liable even when the discriminatory client is not, *id.* at 17:

> A staffing firm that provides job placements for nurses receives a job order from an individual client for a white nurse to provide her with home-based nursing care.  The firm agrees to refer only white nurses for the job.  The firm is violating Title VII, both as an employment agency for its discriminatory referral practice and as an employer for the discriminatory job assignment.  The client is not covered by Title VII because she does not have fifteen or more employees.

And, the EEOC clarified that staffing firms are liable if they "participate[] in the client's discrimination."  *Id.* at 18.  It continued, *id.* at 18-19:

---

such as a temporary employment agency or contract firm…."  *Id.*  Although the parties do not refer to Williams as a "contingent worker," it is clear that she falls within this category.

For example, if the firm honors its client's request to remove a worker from a job assignment for a discriminatory reason and replace him or her with an individual outside the worker's protected class, the firm is liable for the discriminatory discharge.  The firm is also liable if it knew or should have known about the client's discrimination and failed to undertake prompt corrective measures within its control.

In my view, defendant's position is at odds with Title VII.  Companies that contract to provide staffing are not insulated from liability, so as to discriminate with impunity, merely because they are satisfying the requests or directives of their clients.  As plaintiff observes in her Surreply, at 3, 5-6:

> First, G4S knowingly honored discriminatory assignment requests from Jai and continues to do so today.  Second, G4S knew that its client had rejected Plaintiff (and other female security personnel) based on their sex and it refused to assign female officers to Jai for that reason.  In view of the fact that the agency responsible for enforcing Title VII has explicitly rejected the 'my client made me do it' defense, it is somewhat shocking that G4S persists in asserting it.
>
> *   *   *
>
> Under Defendant's reasoning, it would be perfectly permissible for G4S to provide security services to white supremacist organizations even if it is only able to assign white employees to perform such services because its clients refuse to accept African-American employees, as long as G4S does not own the property upon which its employees work.  In view of the ever growing number of contingent employees in this country, Defendant's argument—if accepted—would render Title VII and other employment discrimination laws meaningless.

Despite my rejection of defendant's legal argument that it cannot be liable for the discriminatory policy of Jai, its client, I am not prepared to find, on this record, that defendant did so discriminate, so as to warrant granting plaintiff's cross motion for summary judgment as to Count I.  As discussed, the case is replete with factual disputes.  Moreover, in regard to plaintiff's cross motion, I must construe the facts in the light most favorable to defendant.  And, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge.'"  *Okoli*, *supra*, 648 F.3d at 231

(quoting *Liberty Lobby*, *supra*, 477 U.S. at 255).

Although Davis, Ferguson, and Paros concede that Jai had a discriminatory preference for

male guards, and confirm that plaintiff was removed from the training session at Jai as a result of

that preference, they deny that Wackenhut/G4S was complicit in carrying out Jai's

discriminatory policy.   As noted, Davis disputed that he was "only supposed to assign male

CPOs or security personnel to Jai…."  Plaintiff's Exh. 6 at 53:3-7.  According to Ferguson,

although Jai "did prefer to have male security guards at its locations, it was not a formal

requirement that no female security guards work those sites."  Defendant's Exh. 2 ¶ 23.  And,

Paros insisted, Defendant's Exh. 6 at 34:21-35:7 (emphasis added):

> Wackenhut does not discriminate.  G4S does not discriminate.  *And if a person
> was qualified, we would offer that person to a client*.  If the client refused to
> accept that person, for any reason under their contractual right to do so, *we would
> not participate any further in whatever they're doing, and we would place that
> employee in a proper position that they're qualified for.*

To be sure, it appears from the record that, for the duration of defendant's contract with

Jai, defendant did not place a female employee with Jai.  But, it is not clear from the record

whether Jai had any employment opportunities for plaintiff; how many females were employed

by Wackenhut/G4S; or how many of those female employees were qualified to work at Jai.  The

disputes regarding opportunities for plaintiff to work at Jai, and whether Wackenhut/G4S carried

out Jai's discriminatory policy, are arguably a thin reed, but they are sufficient to defeat

plaintiff's cross motion for summary judgment.[21]

---

[21] In making this determination, I am mindful that plaintiff concedes that "damages," a
matter encompassing most of these questions, "will need to be determined by a jury."  Response
at 22.  And, the case must also go forward as to the retaliation claim (Count II).

For all of these reasons, I will deny the parties' respective motions for summary judgment as to plaintiff's claim of sex discrimination (Count I).  A separate Order follows.


Date: May 11, 2012                                   _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge